# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| **SINGLE SOURCE, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )      **Civil Action No.** |
| **v.** | )      **08-40176-FDS** |
| | ) |
| **CENTRAL REGIONAL TOURISM** | ) |
| **DISTRICT, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM AND ORDER CERTIFYING QUESTIONS OF STATE LAW
## TO THE SUPREME COURT OF CONNECTICUT

This dispute arises from a series of contracts between a Massachusetts corporation and a former tourism district of the state of Connecticut. In 2003, plaintiff Single Source, Inc. agreed to license a body of photographic images for a period of time to the Greater Hartford Tourism District ("GHTD"). Single Source alleges that GHTD did not return the images, as was required by the contracts. The complaint asserts three claims for breach of contract and seeks the damages set forth in the contract for failure to return.

The defendant in this matter is the Central Regional Tourism District, Inc. ("CRTD"). In 2003, the Connecticut legislature reorganized the government entities responsible for promoting tourism in the state. As part of the reorganization, it dissolved GHTD and the ten other then-existing tourism districts and replaced them with CRTD and four other "regional tourism districts." Single Source contends that CRTD is the successor-in-interest to GHTD, responsible for its predecessor's contractual obligations.

CRTD filed a motion for summary judgment, raising two arguments. First, it maintained

that it is not the legal successor to GHTD, so cannot be held liable for the breach of a contractual obligation assumed by GHTD. In the alternative, it contended that even if it is GHTD's successor-in-interest, Connecticut General Statute § 10-397a—which provides, among other things, that CRTD may assume the liabilities of a former tourism district if it votes to do so—affords an absolute defense to liability. Single Source responded that if section 10-397a is interpreted to extinguish its rights under the contracts, the state of Connecticut has impaired a contractual obligation in violation of the Contract Clause of the United States Constitution.

This Court denied the motion for summary judgment without prejudice to its renewal and ordered the parties to submit briefing on whether questions of state law should be certified to the Supreme Court of Connecticut under General Statute § 51-199b. Both parties represented that certification would be appropriate, and the Court agrees. The case turns on questions of Connecticut law that will likely prove determinative in the case, but for which this Court can locate no controlling appellate decision, constitutional provision, or statute of the state. The interests of comity and cooperative judicial federalism will be best promoted by affording the Connecticut Supreme Court the opportunity, in the first instance, to interpret a state statute that is challenged as effecting an unconstitutional impairment of contract.

The following statement of facts and discussion of the relevant legal framework furnish the background for the questions to be certified.

I.    **Factual Background**

   A.    **The Dispute over the Photographs**

Single Source, Inc. is a supplier of professional photographs and photographic services. Its principal place of business is in Oxford, Massachusetts. The Greater Hartford Tourism

District ("GHTD") was a state-created entity based in Hartford, Connecticut that promoted tourism in the Connecticut River valley area.[1]

Single Source and GHTD executed several contracts from 1996 to 2001 that, in essence, granted GHTD a license to use certain photographic images owned by Single Source for a period of time. These contracts were often (but not always) accompanied by delivery contracts that contained "terms of delivery."[2] Although the language varied among the several delivery contracts, they all included provisions that required GHTD to return the images to Single Source after the relationship had ended. The delivery contracts also set out fees for which GHTD would be responsible if it delayed the return of the images or failed to return them altogether.

The contractual relationship between Single Source and GHTD ended on August 15, 2003. Single Source alleges that 159 photographs were never returned by GHTD, and that 1,505 photographs were returned on October 5, 2004, which (it alleges) was 59 weeks late. There is some evidence that the Central Regional Tourism District ("CRTD"), the regional tourism district that now encompasses most of the geographic region previously serviced by GHTD and the defendant in this matter, used Single Source's images through April 2004. (McElholm Aff. ¶ 5; Pl.'s Facts ¶ 4, Ex. D).[3] Plaintiff has contacted CRTD on several occasions to recover the images that it lent to GHTD, without success.[4]

---

[1] GHTD was created by General Statute § 32-302. (Moore Aff. ¶ 4). That statute was repealed effective August 20, 2003.

[2] The December 1998, January 2000, and November 2000 Renewal Agreements were not accompanied by any "Delivery Contracts."

[3] CRTD denies ever using, copying, or printing any of Single Source's images. (Moore Aff. ¶ 8).

[4] CRTD contends that plaintiff did not contact it until April 2006 to request return of the property. (Moore Aff. ¶ 7).

### B.     Connecticut's 2003 Tourism Reorganization

Prior to 2003, GHTD was one of eleven regional tourism districts in Connecticut.  The districts were overseen by Connecticut's Office of Tourism within the state's Department of Economic and Community Development.

In August 2003, the Connecticut General Assembly reorganized the state agencies responsible for promoting tourism.  2003 Conn. Special Act 6 §§ 210, 215; (Moore Aff. ¶ 4).  The legislature consolidated six arts and culture agencies, including the Office of Tourism, into a newly-created "successor agency," the Connecticut Commission on Culture and Tourism.  Conn. Gen. Stat. § 10-392(d).[5]  Within this new Commission were established five regional tourism districts that replaced the eleven pre-existing tourism districts.  *Id.* § 10-397; (Moore Aff. ¶ 4).  CRTD is one of the five regional tourism districts.  As a matter of geographical coverage, it subsumed GHTD, as well as portions of several of the other former districts.  *See* Conn. Gen. Stat. § 10-397; (Moore Aff. ¶ 4).

From August 2003 until the summer of 2004, CRTD was in a period of transition.  There is some dispute as to when GHTD ceased to exist and when CRTD became operational.  In an affidavit introduced in support of defendant's motion for summary judgment, Deborah Moore, a board member of CRTD, states that GHTD was dissolved and CRTD was formed on August 20,

---

[5] Connecticut law provides as a general matter for the transfer of existing obligations from one governmental agency to another as part of any governmental reorganization.  *See* Conn. Gen. Stat. § 4-38d(a) ("A department, institution, agency or authority to which functions, powers or duties are assigned or transferred under the provisions of any act of the General Assembly shall constitute a successor as to such matters . . .").  Under the statutory scheme, successor agencies "may" fulfill, "in the same manner and under the same terms and conditions and with the same effect," any "contract, right of action or matter" undertaken by the predecessor agency.  *Id.* § 4-38d(d).  The statute requires that predecessor agencies "deliver" to successor agencies "all contracts, books, maps, plans, papers, records and property pertaining to or used in connection with the functions, powers or duties so assigned or transferred."  *Id.* § 4-38d(f).

2003, the effective date of Conn. Gen. Stat. § 10-397. (Moore Aff. ¶ 4). In its memorandum in support of summary judgment, however, defendant contended that GHTD was dissolved on June 3, 2004, the effective date of a different statute, Conn. Gen. Stat. § 10-397a. Plaintiff places the dissolution of GHTD later than August 2003, noting that it received a payment from GHTD dated November 17, 2003. (McElholm Aff. ¶ 4). Plaintiff presents further evidence from the Connecticut Office of the Secretary of State indicating that GHTD's name changed to "Central Regional Tourism District" on December 15, 2003. (Pl.'s Facts, Ex. B). In any event, there is no dispute that GHTD is now "in dissolution and out of business." (Moore Aff. ¶ 5).

CRTD is located at 31 Pratt Street, 4th Floor, Hartford, Connecticut, where GHTD was previously located. (Pl.'s Facts, Exs. D, E). CRTD has the same telephone and fax numbers as did GHTD. (Id.).[6]

## C.     The 2004 Statute

The following year, in 2004, the legislature enacted General Statute § 10-397a to govern the transfer of assets and liabilities from former tourism districts to the new regional tourism districts. That statute provides, in relevant part:

> (b) Any former tourism district having a cash surplus, after accounting for all liabilities, may distribute such surplus to the regional tourism district or districts serving the towns formerly served by such district. Any distribution shall be divided among the new district or districts in accordance with the following schedule:
> . . .
> (d)  Any regional tourism district may, by a vote of its board of directors and with the approval of the commission, assume the liabilities of a former tourism district that served all or part of the area served by the new district. No such assumption shall be approved unless (1) the regional district's approved budget makes

---

[6] Plaintiff states in its memorandum that CRTD voluntarily assumed some of GHTD's liabilities, such as its lease, but does not cite to evidence in the record to support that contention.

provision for the costs arising from the assumption of liability; and (2) the commission finds that the proposed assumption of liability is fair and equitable.

Conn. Gen. Stat. § 10-397a.

Section 10-397a became effective on June 3, 2004. Since that time, CRTD's board of directors has not voted to assume the liabilities of GHTD pursuant to the procedure outlined in subsection (d) of the statute. (Moore Aff. ¶ 6). It has never accounted for GHTD's liabilities in its budget, nor has it submitted a statement proposing assumption of GHTD's liabilities to the Commission for approval. (*Id.*). The Moore affidavit describes these omissions as "the decision[s] of CRTD not to assume any liabilities of the Greater Hartford Tourism District, Inc." (*Id.* ¶ 7).

## II.  <u>Procedural Background</u>

Single Source filed this complaint against CRTD in September 2008. It contains three counts: breach of contract for the lost photographs (Count 1); breach of contract to recover late fees (Count 2); and breach of contract for the improper use of certain images (Count 3). The complaint seeks $237,000 for the unreturned photographs, $443,975 in late fees, reasonable usage fees, and costs and attorney's fees.

CRTD moved for summary judgment on Counts 1 and 2 in October 2009. It raised section 10-397a as an affirmative defense to liability, insisting that it had not assumed GHTD's contractual liabilities when it was created and GHTD was dissolved. Single Source responded that if section 10-397a abrogated GHTD's contractual obligations without providing alternative monetary remedies in the event of a contractual breach, the statute effects a violation of the Contract Clause of the United States Constitution. *See* U.S. CONST. ART. I, § 10, cl. 1.

This Court denied CRTD's motion for summary judgment without prejudice to its renewal. Because the Court deemed it improvident to assess the constitutionality of a state statute without further factual development and consideration of the issues, it ordered the parties to submit supplemental memoranda regarding three issues: (1) the propriety of certifying a question of law to the Connecticut Supreme Court pursuant to General Statute § 51-199b, and the form of any questions; (2) the need for further development of the factual record; and (3) the need for consideration of any other legal issues prior to certification.

CRTD submitted a sparse memorandum suggesting five questions to be certified to the Connecticut Supreme Court. It maintained that the current factual record was sufficient. Single Source suggested that further discovery regarding the corporate status of CRTD and its connection to the state of Connecticut would be prudent. It offered four questions to be certified to the Connecticut Supreme Court.[7] CRTD objected to the form of plaintiff's proposed questions.

## III.  Certification to the Connecticut Supreme Court

Connecticut law provides that "[t]he Supreme Court [of Connecticut] may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen. Stat. § 51-199b(d). In deciding whether to certify a question of law to the Connecticut Supreme Court, a

---

[7] Plaintiff's briefings also purported to raise new claims against CRTD under the Equal Protection Clause of the Fourteenth Amendment and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution. CRTD objected to the equal protection claim. Because plaintiff has not moved to filed an amended complaint, assertion of new claims is not proper at this time. The Court will decline to consider the claims for the purposes of this certification.

court should consider, among other factors: "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007). Certification is particularly appropriate when an unconstrued state statute is susceptible of a construction that may avoid premature adjudication of federal constitutional claims. *L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F. Supp. 1419, 1423 (D. Conn. 1986) (citing *Bellotti v. Baird*, 428 U.S. 132, 146-47 (1976)). The decision to certify a question of law is within the sound discretion of the district court and may be made on the Court's own motion. *See e.g.*, *Hume v. Hertz Corp.*, 628 F. Supp. 763, 767 (D. Conn. 1986).

## IV. Analysis

### A. Subject Matter Jurisdiction and the Status of CRTD

Although neither party has raised the issue, the Court first addresses the threshold matter of its power to adjudicate the case.[8] Subject matter jurisdiction, according to plaintiff, is premised on the diverse citizenship of the parties. The diversity statute provides, "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). While plaintiff's status as a citizen of Massachusetts is plain, CRTD's status as a citizen of Connecticut is less obvious.

It is settled law that a state is not a "citizen" under § 1332. *E.g.*, *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973); *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487

---

[8] Federal courts must examine the basis for subject matter jurisdiction, even if neither party has raised a jurisdictional question. *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977) ("[W]e are obliged to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction.").

(1894); *University of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1202 (1st Cir. 1993). A political subdivision of a state, however, is presumed a citizen of the state for federal diversity jurisdiction purposes unless it operates as "the arm or alter ego of the State." *Moor*, 411 U.S. at 717 (quoting *State Highway Comm'n of Wyo. v. Utah Constr. Co.*, 278 U.S. 194, 199 (1929)). If CRTD is an arm of the state, it is not a citizen of Connecticut. On the other hand, if CRTD is a political subdivision of Connecticut, akin to a municipality or a public corporation, it is considered a citizen of the state and diversity jurisdiction exists.

The Court must therefore consider whether CRTD is an arm of the state, and by extension, whether Connecticut is the real party in interest. *See A.W. Chesterton*, 2 F.3d at 1203. Whether an entity functions as an arm of the state is a question of federal law. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997); *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir. 2003). Because this question must be answered by consulting the state-law provisions that define the character of the entity, however, decisions rendered by state courts may inform the analysis. *See, e.g.*, *Pastrana-Torres v. Corporación de Puerto Rico para la Difusión Pública*, 460 F.3d 124, 126 (1st Cir. 2006); *Redondo Constr. Corp. v. Puerto Rico Highway & Transp. Auth.*, 357 F.3d 124, 128 n.3 (1st Cir. 2004).

In *A.W. Chesterton*, the First Circuit set forth a non-exhaustive collection of criteria to be considered in the arm-of-the-state analysis. *See* 2 F.3d at 1205. The criteria were drawn from factors employed to determine whether an entity is an arm of the state for purposes of Eleventh Amendment immunity. *See id.*; *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935, 939-40 (1st Cir. 1993); *In re San Juan DuPont Plaza Hotel Fire Litig.*, 888 F.2d

940, 942 (1st Cir. 1989); *Ainsworth Aristocrat Int'l Pty. Ltd. v. Tourism Co. of P.R.*, 818 F.2d

1034, 1038 (1st Cir. 1987). The indicators of independence from the state include

> whether the entity (1) performs an "essential" or "traditional" governmental
> function, as opposed to a nonessential or merely proprietary one; (2) exercises
> substantial autonomy over its internal operations; (3) enjoys meaningful access to,
> and control over, funds not appropriated from the State treasury; (4) possesses the
> status of a separate "public corporation"; (5) may sue and be sued in its own
> name; (6) can enter into contracts in its own name; (7) has been granted a state tax
> exemption on its property; or (8) has been expressly debarred from incurring debts
> in the State's name or behalf.

*A.W. Chesterton*, 2 F.3d at 1205 (citing, *inter alia*, *Metcalf & Eddy*, 991 F.2d at 939-40).

Because of the "essential similarity" between the arm-of-the-state analysis in the diversity and

Eleventh Amendment contexts, courts have used the same criteria to evaluate both questions.

*A.W. Chesterton*, 2 F.3d at 1203 n.4; *see also CBR Holdings, L.P. v. Hotel Dev. Corp.*, 203 F.

Supp. 2d 131, 134 (D.P.R. 2002); *New England Multi-Unit Hous. Laundry Ass'n v. Rhode*

*Island Hous. & Mortg. Fin. Corp.*, 893 F. Supp. 1180, 1189 (D.R.I. 1995) (reasoning that

because the tests are "virtually identical, . . . one analysis will suffice" for jurisdictional and

immunity purposes); *Treasurer of Conn. v. Forstmann Little & Co.*, 2002 WL 31455245, at *2

(D. Conn. Oct. 15, 2002) (referring to the two inquiries as "parallel and essentially equivalent").[9]

---

[9] In light of intervening decisions from the Supreme Court, the First Circuit in 2003 reformulated the arm-of-the-state analysis in the Eleventh Amendment context. *See Fresenius*, 322 F.3d at 59. Under the *Fresenius* framework, a court first asks whether an entity created by a state is structured to share in the state's sovereignty. *Id.* at 68. The factors articulated in *A.W. Chesterton* and *Metcalf & Eddy* drive that inquiry. *Id.* If the factors point in different directions, the court then assesses the risk that damages awarded to the plaintiff would be paid from the public treasury. *Id.* While merely relevant to the multi-factor test, this second question is now dispositive in the Eleventh Amendment context. *Id.*

The updated arm-of-the-state analysis derives from twin aims of the Eleventh Amendment: protection of states' fiscal interests and preservation of states' dignity interests in not being haled into federal court absent consent. *E.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 58 (1996); *Fresenius*, 322 F.3d at 63. While the diversity statute also implicates the latter, fiscal concerns are less present in the jurisdictional context. The First Circuit has not directly extended the *Fresenius* framework to the § 1332 analysis, and other courts in this district have continued using the *A.W. Chesterton* framework in post-*Fresenius* jurisdictional analyses. *See, e.g., Tang v.*

The factors assist in what is essentially a functional inquiry, designed to ascertain whether the entity possesses "a sufficiently independent corporate character to dictate that it be treated as a citizen" of the state that created it. *A.W. Chesterton*, 2 F.3d at 1204 (quoting *Moor*, 411 U.S. at 721). Against the backdrop of these principles, the Court turns to evaluate CRTD's status.

The Connecticut legislature created CRTD in 2003 as a part of its reorganization of the state's tourism and arts and culture agencies. *See* Conn. Gen. Stat. § 10-397. It simultaneously dissolved eleven former tourism districts, including GHTD, and established five new regional tourism districts, including CRTD, in their stead. *Id.* Like its four companion regional tourism districts, CRTD is located within the Connecticut Commission on Culture.

At first blush, several of the *A.W. Chesterton* factors support an inference that CRTD is an arm of Connecticut. It is an entity created by state law and it is located within the Commission, which is the parent agency and indisputably an arm of the state. Conn. Gen. Stat. §§ 10-392(d), 10-397. The Commission is charged with overseeing and promoting cooperation among the five regional tourism districts, including CRTD. *Id.* § 10-396. Appointments to CRTD's board of directors are reported to the executive director of the Commission. *Id.* § 10-397(b). The Commission was charged with assisting CRTD in holding its initial board of directors meeting and establishing a committee to draft its charter and bylaws. *Id.* § 10-397(d).

CRTD was created to stimulate economic development by promoting and marketing travel destinations within its boundaries. Conn. Gen. Stat. § 10-397(a). The First Circuit has

---

*Division of Sexually Transmitted Disease Control & Prevention*, 2008 WL 5101366, at *2 (D. Mass. Dec. 1, 2008). Because CRTD does not contend that it shares Connecticut's immunity from suits in federal court under the Eleventh Amendment, and because the fiscal interests reflected in the *Fresenius* framework are of less import for jurisdictional purposes, the Court will employ the analysis outlined in *A.W. Chesterton*.

previously observed that the promotion of a state's tourism industry can be considered a "vital government function." *See In Re San Juan Dupont Plaza Hotel*, 888 F.2d at 944; *see also CBR Holdings*, 203 F. Supp. 2d at 135, 138 (finding that a public corporation created by state law to promote tourism in Puerto Rico is an arm of the state). CRTD is not constituted specifically as a "public corporation" or a "body politic and corporate" in its enabling statute, nor is it empowered to sue and be sued in its own name. The text of the statute does not confer upon it power to enter into contracts in its own name. As a public entity, it is subject to Connecticut's Freedom of Information Act, Conn. Gen. Stat. §§ 1-200 *et seq.* *See* Conn. Gen. Stat. § 10-397(c). Sales of tangible personal property or services to CRTD are exempt from the state sales tax. Conn. Gen. Stat. § 12-412(93).

Several fiscal indicators also suggest that CRTD is an arm of the state. It is an entity funded in part by the public treasury, and its budget depends on state appropriations.[10] CRTD must submit its proposed annual budget to the Commission, which in turn must approve of the budget before the district may expend funds. *Id.* § 10-394. If the Commission disapproves of the proposed budget, CRTD must adopt an interim budget that remains in effect until the Commission approves of a modified budget. *Id.* In addition, CRTD must submit its budget, with an accompanying narrative explaining its expenditures, to the standing committees of Connecticut General Assembly responsible for appropriations and to the state's Office of Policy and Management. *Id.* To standardize the budget review process, the Commission is charged with establishing a uniform financial reporting system to be used by CRTD and the other regional tourism districts. *Id.* § 10-392(b)(7). Finally, CRTD must submit an annual independent audit,

_____

[10] The record does not clarify what percentage of CRTD's annual budget derives from public financing.

performed in compliance with General Statutes §§ 4-230 to 4-236, to the Commission and to the state's Office of Policy and Management and Office of Fiscal Analysis. *Id.* § 10-397(e).

On the other side of the balance, however, are notable factors suggesting that CRTD is more analogous to a public corporation or a political subdivision of the state than an arm of the state. Several statutory provisions suggest that the legislature intended for regional tourism districts to retain a municipal character.[11] Unlike the Commission, whose commissioners are appointed by state officials, the board of directors of a regional tourism district consists of one representative from each municipality within the district, appointed by the legislative body of the municipality. *Compare* Conn. Gen. Stat. § 10-393, *with id.* § 10-397(b).[12] Those appointed board members in turn may appoint up to 21 additional board members who represent tourism interests within the district. *Id.* § 10-397(b).[13]

The institution with the power of appointment for an entity often exerts meaningful control over that entity. *See Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1149 (3d Cir. 1995) ("State authority over the appointment of Commission members lends obvious support

---

[11] Several Connecticut statutes concern "districts." *See, e.g.*, Conn. Gen. Stat. § 7-324 (defining a "district" as "any fire district, sewer district, fire and sewer district, lighting district, village, beach or improvement association and any other district or association, except a school district, wholly within a town and having the power to make appropriations or to levy taxes"); Conn. Gen. Stat. § 7-339n (defining a "special services district" as a "body politic and corporate" that can, among other things, sue and be sued, acquire and hold property, and enter into contracts). Under these statutes, a "district" is a governmental entity wholly contained within one municipality; the districts are therefore only marginally analogous to regional tourism districts, which span many municipalities. To the extent that these statutes can inform the arm-of-the-state analysis, they suggest that the Connecticut legislature employs the term "district" to refer to a body politic and corporate that possesses and exercises some degree of governmental power. *Cf. Dugas v. Beauregard*, 155 Conn. 573, 577-79 (1967) (assessing whether consolidation districts contained within a city are units of local government or merely geographic subdivisions).

[12] In addition, a member of the board of directors of a regional tourism district may not serve as a commissioner on the Connecticut Commission on Culture and Tourism. Conn. Gen. Stat. § 10-393(b).

[13] Members of the board of directors serve three-year terms. Conn. Gen. Stat. § 10-397(b).

13

to a finding of sovereignty."); *A.W. Chesterton*, 2 F.3d at 1207 ("The power of appointment (and reappointment) is significant, and may entail risks of subtle or indirect manipulation of the entity's decisionmaking processes.").  While the members of CRTD's board of directors are overseen by the Commission, they are also accountable to the appointing municipalities' legislative bodies.  *Cf. City of Norwich v. Housing Auth.*, 216 Conn. 112, 122 (1990) (explaining that a housing authority created by the state but dependent upon municipal action in order to come into existence is a "hybrid organization[] bearing many strong aspects of local authority and equally strong aspects of state authority").  The municipal appointment power here accordingly weighs against a finding that CRTD is an arm of the state.

Members of CRTD's board of directors are not considered state employees by virtue of their service with CRTD.  Conn. Gen. Stat. § 10-397(b) ("No board member shall be deemed a state employee for serving on said board.").  Elsewhere in the statutory code, regional tourism districts are categorized as "municipalities"—and their boards of directors as "legislative bod[ies]"—for the purposes of determining tourism district employee retirement benefits.  Conn. Gen. Stat. § 7-425(1), (3).  The statutory provisions governing audits for recipients of state financial assistance group regional tourism districts with municipalities, regional planning agencies, and other political subdivisions as "[n]onstate entit[ies]."  Conn. Gen. Stat. § 4-230(10), (15), (16).

Although the legislature did not denominate CRTD a "body politic and corporate" or a "public corporation," it possesses several attributes of a public or municipal corporation.  In Connecticut, a public corporation is "an instrumentality of the state, founded and owned in the public interest, supported by public funds, and governed by those deriving their authority from the

state." *Edson v. Griffin Hosp.*, 144 A.2d 341, 343 (Conn. Super. Ct. 1958). Its officers and managers are "representatives of the state or any political subdivision" of the state. *Id.* CRTD conforms with each of these criteria: it was created by the state to promote tourism and economic development, it is supported by appropriations from the public treasury, and members of its board of directors are appointed by municipalities that derive their authority from the state. In Connecticut, other similar entities created by the state to service regional districts are designated public corporations and political subdivisions. *See, e.g.*, *Lopa v. Brinker Int'l, Inc.*, 296 Conn. 426, 431 (2010) (explaining that in the context of Conn. Gen. Stat. § 31-275(10), public corporations are "corporations organized for a public purpose such as municipalities and counties"); *Local 530, AFSCME v. City of New Haven*, 9 Conn. App. 260, 262 (1986) (describing an authority established to service a regional water district as a "public corporation, a public instrumentality and a political subdivision").

Although apparently of little significance in the *A.W. Chesterton* analysis, it is nonetheless notable that both plaintiff and defendant understand CRTD to be a corporation. The complaint describes CRTD as a "Connecticut corporation," and the answer agrees that "CRTD was statutorily created in 2004 as a corporation pursuant to Connecticut General Statute 10-397, et seq." (Compl. ¶ 2; Ans. ¶ 2).[14] Plaintiff has also presented evidence that CRTD is registered with the Office of the Secretary of State as a corporation. (*See* Pl.'s Facts, Ex. B).

---

[14] CRTD also filed a corporate disclosure statement, purportedly in compliance with Fed. R. Civ. P. 7.1(a) and Local Rule 7.3. In the disclosure statement, CRTD described itself as a "nongovernmental corporate party . . . [with] no parent corporation." The Court discounts this characterization, however, as CRTD does not appear to be a non-governmental party.

In *Gagnon v. Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 841-43 (2006), the Connecticut Appellate Court evaluated, among other matters, a wrongful discharge claim against one of the eleven predecessor tourism districts.[15] While the court did not explicate the status of the former tourism district, aspects of the decision are noteworthy. The tourism district was sued in its own name and apparently did not raise a sovereign immunity defense, even though the plaintiff sought monetary damages. Moreover, as part of the court's consideration of the wrongful discharge claim, it assumed without discussion that the tourism district could enter into contracts. *See id.* These considerations weigh against a finding that the district is an arm of the state. *See A.W. Chesterton*, 2 F.3d at 1205.

CRTD also possesses some fiscal autonomy from the state. It is required by statute to solicit private donations to supplement funding it receives from the state and is empowered to determine whether or not to accept private funds. Conn. Gen. Stat. § 10-397(f) ("Each regional tourism district shall solicit and may accept private funds."). If it chooses, it may establish its own bank account, independent of the Commission's bank account, into which it may deposit funds. *Id.* These provisions suggest that CRTD "enjoys meaningful access to, and control over, funds not appropriated from the State treasury." *A.W. Chesterton*, 2 F.3d at 1205.

Taken together, these factors indicate that CRTD is a political subdivision of the Connecticut, closest in nature to a public corporation. Most persuasive in the ultimate analysis is the district's structural independence from state control. CRTD is governed by its own charter

---

[15] *Gagnon* is the only reported case that this Court can locate involving a former tourism district or a post-reorganization regional tourism district. As there is no reason to believe that the 2003 reorganization substantively changed the status of tourism districts, the court's reasoning in *Gagnon* can be taken as relevant to assessing the status of regional tourism districts.

and bylaws and is managed by a legislative body, its board of directors. In this respect, it retains a substantial degree of autonomy over its internal operations. To the extent that governmental bodies exercise control over CRTD, it is more directly accountable to municipal appointing authorities than it is to state authority. While appointments to CRTD's board of directors are reported to the Commission, it is the municipalities that exercise meaningful oversight and influence as the constituting entities. There is little evidence from which the Court could conclude that the state itself exercises meaningful organizational control over CRTD.

The Connecticut legislature has repeatedly signaled that regional tourism districts are more analogous to municipal instrumentalities than alter egos of the state. While its enabling statute does not specifically confer upon CRTD the status of a public corporation or a body politic and corporate, the Court credits the other statutes that categorize CRTD among municipal "non-state entit[ies]" for auditing and employee retirement benefits purposes. *See* Conn. Gen. Stat. §§ 4-230(16), 7-425(1). That the legislature excluded members of CRTD's board of directors from classification as state employees reinforces the conclusion that it is a political subdivision. Conn. Gen. Stat. § 10-397(b). And despite the absence of statutory authorization for CRTD to sue and be sued and enter into contracts in its own name, *Gagnon* suggests that tourism districts implicitly enjoy these powers. *See* 92 Conn. App. at 841-43. Indeed, GHTD entered into the contracts at issue in this case in its own name, without purporting to bind the state of Connecticut.

Finally, CRTD possesses some degree of fiscal autonomy from the state. On the one hand, its statutory obligation to submit an annual budget to the Commission, and obtain approval before it may expend funds, is indicative of state monitoring of the organization's finances. And financial assistance from the state constitutes a portion of CRTD's budget. On the other hand,

the legislature required CRTD to solicit private donations to supplement its budget. Conn. Gen. Stat. § 10-397(f).[16] This obligation suggests that CRTD does have meaningful access to funds that do not derive from the state treasury. In addition, CRTD's authority to deposit those funds in an independent bank account indicates that it has organizational control over its finances.

Careful consideration of these factors leads to the conclusion that, for the purposes of establishing diversity jurisdiction, CRTD is not an arm of the state of Connecticut. Rather, is an autonomous entity, akin to a political subdivision or a public corporation. It therefore is a citizen of Connecticut, and this Court has subject matter jurisdiction under 28 U.S.C. § 1332.

Several consequences flow from this analysis of CRTD's status. First, because CRTD is not deemed an arm of the state, it is unlikely that CRTD is entitled to the protection of Connecticut's immunity from suit in federal court under the Eleventh Amendment. Although the Court has conducted the arm-of-the state analysis for the purposes of assessing its jurisdiction under § 1332, the Eleventh Amendment arm-of-the-state analysis differs only slightly. *Compare Fresenius*, 322 F.3d at 68, *with A.W. Chesterton*, 2 F.3d at 1205. As CRTD has not raised an immunity defense, the Court need not reach the question of whether CRTD is an arm of the state in the Eleventh Amendment context.

Second, there is no administrative exhaustion prerequisite to an action seeking monetary damages against CRTD. In general, a plaintiff may not bring an action for damages against Connecticut or any of its agencies without first obtaining authorization from the claims commissioner to do so. *Columbia Air Servs., Inc. v. Department of Transp.*, 293 Conn. 342, 351

---

[16] It is not clear whether the state of Connecticut would ultimately be responsible for money damages if CRTD is found liable but is unable to cover the cost of those damages.

(2009); *Miller v. Egan*, 265 Conn. 301, 317 (2003). When the claims commissioner deems it "just and equitable," he may "authorize suit against the state on any claim which . . . presents an issue of law or fact under which the state, were it a private person, could be liable." Conn. Gen. Stat. § 4-160(a). Because CRTD is not an arm of the state of Connecticut, however, this action is not a suit against the state, and no exhaustion requirement applies.[17]

### B.    Is CRTD the Successor of GHTD?

The Court next turns to the question of whether CRTD is the successor-in-interest to GHTD, and thus responsible for its contractual liabilities. Plaintiff insists that CRTD is GHTD's successor, bound by GHTD's contractual obligations and subject to suit for the breach of those obligations. CRTD, however, contends that because plaintiff entered into the disputed contracts with GHTD, GHTD is the real party in interest in this case. Although CRTD maintains that it is not the successor to GHTD, it does not identify any other successor entity, and thus suggests that plaintiff is simply without a remedy.

As an initial matter, it seems likely that if GHTD has been dissolved, the suit cannot proceed against it. Under well-established common-law principles, no valid judgment may be rendered against a corporation that has dissolved unless a statute extends the life of the corporation for litigation purposes. *See, e.g.*, *Defense Supplies Corp. v. Lawrence Warehouse Co.*, 336 U.S. 631, 634-35 (1949) ("[A] time-honored feature of the corporate device is that a corporate entity may be utterly dead for most purposes, yet have enough life remaining to litigate its action. All that is necessary is a statute so providing."); *Oklahoma Natural Gas Co. v.*

---

[17] This conclusion is supported by *Gagnon v. Housatonic Valley Tourism District Comm'n*, 92 Conn. App. 835 (2006). In that case, the court did not mention any prior authorization from the claims commissioner as a prerequisite to plaintiff's action for monetary damages against a former tourism district.

*Oklahoma*, 273 U.S. 257, 259 (1927) ("It is well settled that at common law and in the federal jurisdiction, a corporation which has been dissolved is as if it did not exist."); *Asociacion de Empleados del Area Canalera v. Panama Canal Comm'n*, 453 F.3d 1309, 1313 (11th Cir. 2006). The parties do not dispute that the Connecticut legislature dissolved GHTD by repealing its enabling statute, section 32-302, and enacting section 10-397. The Court can find no statute that extends GHTD's life for the purposes of litigation or for settling claims against the former district. Thus, if the common-law principle applies, no judgment can be rendered against GHTD, which has not existed as a legal entity since sometime in 2003 or 2004.

Because plaintiff could not have maintained a breach of contract action against GHTD as a dissolved entity, the question is whether CRTD succeeded to GHTD's liabilities. "Generally, when a government agency, commission, or corporation expires, Congress (or the state legislature) appoints a successor in interest or establishes a method of identifying a successor." *Organic Cow, LLC v. Center for New England Dairy Compact Research*, 335 F.3d 66, 71-72 (2d Cir. 2003).[18]

Here, sections 10-397 and 10-397a do not explicitly designate CRTD as the successor to GHTD, nor do they provide a straightforward method for determining the successors-in-interest to the former tourism districts. As noted, however, the provisions do contemplate that CRTD

---

[18] The Connecticut legislature has enacted statutes on multiple occasions that govern the reorganization of governmental machinery and designate successor entities with some precision. For example, when the state dissolved the Hartford Board of Education and transferred its authority to the State Board of Trustees, the relevant statute stated that "the State Board of Trustees . . . [became] solely responsible for the management of the Hartford School district." *Lee v. City of Hartford/Hartford Pub. Schs.*, 289 F. Supp. 2d 25, 27 (D. Conn. 2003) (quoting 1997 Conn. Special Act 4 § 2 (enacted Apr. 18, 1997)). It also required the assignment to the Board of Trustees of all contracts made on behalf of the Hartford Board of Education. *Id.* at 27-28 (citing 1997 Conn. Special Act 4 § 4). *See also* Conn. Gen. Stat. § 6-2a (providing that the state of Connecticut succeeds to "all debts, obligations, liabilities and duties" of county governments); Conn. Gen. Stat. § 17a-2(b) (designating the Department of Children and Families as the successor agency to the Department of Children and Youth Services).

will service substantially the same geographic region and population as GHTD. CRTD is the regional tourism district designated to encompass the majority—but not all—of the territory formerly covered by GHTD. Conn. Gen. Stat. § 10-397(a)(2). With respect to boundaries, there is thus a close, but not a perfect, match between the old entity and the new entity. CRTD also may succeed to almost all—but not all—of GHTD's assets. Section 10-397a(b) provides that, "after accounting for all liabilities," GHTD may distribute 95% of its remaining assets to CRTD, and the remaining 5% to the Northwestern Regional Tourism District. If CRTD opts to transfer its assets, the asset-distribution schedule is mandatory. *Id.* In addition, section 10-397a permitted GHTD to transfer its "noncash assets, including fixed assets and leases" to the regional tourism district servicing the same towns—which, in this case, is CRTD. *Id.* § 10-397a(c). This channeling of 95% of GHTD's cash assets, as well as its noncash assets, to CRTD suggests a legislative intent that CRTD succeed GHTD.[19]

On the other hand, the statutes are at best ambiguous as to whether CRTD succeeds to GHTD's liabilities and obligations. Section 10-397a does not contain a liability distribution schedule comparable to the asset distribution schedule. Instead, the statute seemingly makes the transfer of liabilities from former tourism districts to regional tourism districts optional. *See id.* § 10-397a(d). Had the legislature intended for CRTD to assume GHTD's liabilities, or 95% of those liabilities, presumably it would have said so. Instead, the statute seems to permit liabilities to fall into something of a statutory limbo. Complicating matters further is the substantial time

---

[19] Plaintiff also has submitted the following functional evidence supporting the inference that CRTD is GHTD's legal successor: (1) GHTD's name was changed to "Central Regional Tourism District, Inc." in a filing with the Connecticut Office of the Secretary of State; (2) CRTD is physically located in the office in which GHTD was previously located; (3) CRTD uses the same telephone and fax numbers that GHTD previously used; and (4) CRTD has derived benefit from GHTD's contract by using plaintiff's photographs in its promotional materials.

gap between the enactment of the statute reorganizing the tourism districts (in August 2003) and the statute addressing the transfer of assets and liabilities (in June 2004). It is at least theoretically possible that when section 10-397 was enacted, the liabilities of former tourism districts that existed as of August 2003 automatically transferred to the new tourism districts as a matter of law. But if that is so, the subsequent enactment of section 10-397a(d) would serve little purpose.

It is unclear whether the ambiguities in the statutory structure pertaining to succession can be resolved by resort to common-law principles. It has long been established that when a legislature dissolves a municipal corporation and creates a new legal entity composed of substantially the same population and encompassing substantially the same territory, the new municipal entity is the legal successor to the rights and obligations of the dissolved entity. *See, e.g.*, *Port of Mobile v. Watson*, 116 U.S. 289, 300-01 (1886) (holding, presumably under principles of general federal common law, that after the Alabama legislature dissolved the City of Mobile by statute and, on the same day, created the Port of Mobile to cover substantially the same territory and taxable property, the port was the legal successor to the city); 2A E. MCQUILLIN, LAW OF MUNICIPAL CORPORATIONS § 8:15 (3d ed.) ("It is the general rule that after dissolution, where the same or substantially the same inhabitants are erected into a new corporation with extended or restricted territorial limits, such new corporation is treated in law as the successor of the old one.").

State and federal courts have widely adopted the corollary rule that when a municipal entity succeeds to the rights and obligations of a predecessor entity, the reorganized entity is liable for its predecessor's contractual obligations. *See, e.g.*, *Graham v. Folsom*, 200 U.S. 248, 253-54 (1906); *Shapleigh v. City of San Angelo*, 167 U.S. 646, 656 (1897); *Watson*, 116 U.S. at 300-01;

*D'Esterre v. City of New York*, 104 F. 605, 611 (2d Cir. 1900); *Canal Nat'l Bank v. School Admin. Dist. No. 3*, 203 A.2d 734, 739-40 (Me. 1964); *Grishaber v. Town of Callicoon*, 33 N.Y.S. 2d 508, 510 (N.Y. App. Div. 1942); 2A MCQUILLIN § 8:15. In the absence of any express statutory provision to the contrary, therefore, courts presume that a legislature intends for a reorganized municipal corporation to remain subject to the liabilities of its predecessor corporation. *See, e.g.*, *Shapleigh*, 167 U.S. at 656 (explaining that when a legislature reincorporates a municipal entity, "the obligations are not destroyed by a dissolution of the [former] corporation, but it will be presumed that the state intended that they should be devolved upon the new corporation which succeeded, by operation of law, to the property and improvements of its predecessor"); *Broughton v. Pensacola*, 93 U.S. 266, 270 (1876) ("[I]n the absence of express provision for their payment otherwise, it will . . . be presumed . . . that the legislature intended that the liabilities as well as the rights of property of the corporation in its old form should accompany the corporation in its reorganization."); *Branch v. City of Sour Lake*, 9 F.2d 971, 974 (E.D. Tex. 1924), *aff'd*, 6 F.2d 355 (5th Cir. 1925) ("[T]he reincorporation of a city reflects the will of the state for the new concern to assume the obligations of the defunct one."); 2A MCQUILLIN § 8:15.

This rule has been justified on the ground that the successor entity benefits from obligations undertaken by the predecessor, and because either the successor entity or the state must assume the liability in order to avoid impairing contractual obligations. *See, e.g.*, *Shapleigh*, 167 U.S. at 656 (explaining that the successor corporation derives benefits from its predecessor); *Branch*, 9 F.2d at 973 ("[t]he state . . . could not, by a dissolution brought about through its own initiative, impair obligations that were created" by the entity it dissolved); *Grishaber*, 33 N.Y.S.

2d at 510 (holding that the successor municipal corporation to a water district dissolved by the legislature was obligated to fulfill the contractual obligations of the district, because the legislature "could not constitutionally" act "to abolish remedies in force as to existing claims and causes of action"). As the Supreme Court explained in *Port of Mobile v. Watson*, "[T]he remedies for the enforcement of such obligations assumed by a municipal corporation, which existed when the contract was made, must be left unimpaired by the legislature, or, if they are changed, a substantial equivalent must be provided" so as to comply with the Constitution. 116 U.S. at 305.

Of course, pre-*Erie* rules of general federal common law and common-law rules adopted by other states do not necessarily govern the rules of succession applicable to Connecticut's dissolution of an entity in the course of a governmental reorganization. But it is not immediately clear to this Court whether Connecticut law also embraces those principles. The Court cannot locate a definitive statute or case adopting the rule, under Connecticut law, that a reorganized political subdivision succeeds to the liabilities of its predecessor entity and remains responsible for its contractual obligations in the absence of a controlling statute.[20] Nor have the parties directed the Court to any relevant Connecticut authority.

It is as least possible that any ambiguity or gap in the statutory scheme could be explained or filled by these common-law principles. The Court cannot determine, however, whether CRTD succeeded to the liabilities and obligations of GHTD under Connecticut law. The absence of a

---

[20] The Court has identified at least one case from the Connecticut Supreme Court that has treated a larger municipal corporation that merged with a smaller entity as the legal successor to the defunct entity. *See Gilpin v. City of Ansonia*, 68 Conn. 72 (1896) (explaining that the legislature's "alteration of . . . a borough to a city did not break the continuity of its existence").

controlling state court decision or applicable statute regarding this question counsels in favor of certification to the Connecticut Supreme Court.

### C. Contract Clause

CRTD further argues that even if it is the legal successor to GHTD, General Statute 10-397a operates as an absolute defense to liability. Interpreting the statute as providing the only available method by which a successor district assumes its predecessor's liabilities, CRTD contends that it may not be called to answer for GHTD's contractual obligations because its board never voted to assume the liabilities and its budget never made provision for assumption of the liabilities. *See* Conn. Gen. Stat. § 10-397a(d). Put another way, CRTD maintains that section 10-397a would overcome any presumption that the liabilities of a reorganized municipal corporation transfer by law to its successor because the statute makes the assumption of liabilities permissive rather than mandatory. Plaintiff responds that if section 10-397a is interpreted as an absolute defense to CRTD's contractual liabilities, the statute has unconstitutionally impaired its contractual relationship.

The Contract Clause of the United States Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. CONST. ART. I, § 10, cl. 1. "The threshold issue in Contract Clause analysis is whether the change in state law has operated as a substantial impairment of a contractual relationship." *Mercado-Boneta v. Administracion del Fondo de Compensacion Al Paciente*, 125 F.3d 9, 12-13 (1st Cir. 1997) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1991) (internal quotations omitted)). "This inquiry is broken down into three distinct parts: whether there is a contractual relationship, whether a

change in law impairs that contractual relationship, and whether the impairment is substantial." *Id.* The first inquiry is easily satisfied, as the parties agree that a contractual relationship existed.

The second inquiry is the focus of the dispute. The Contract Clause is not implicated when state action brings about a breach of a contract rather than an impairment of a contractual obligation. *See TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344, 348 (2d Cir. 2000) ("[A]n individual breach of contract . . . does not reach constitutional dimensions and create a cause of action based on the contracts clause." (citations omitted)); *see also Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251-52 (7th Cir. 1996); *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 311-12 (8th Cir. 1978). The distinction between mere breach and impermissible impairment "depends on the availability of a remedy in damages." *E & E Hauling, Inc. v. Forest Preserve Dist.*, 613 F.2d 675, 679 (7th Cir. 1980) (citing *Hays v. Port of Seattle*, 251 U.S. 233, 237 (1920)); *accord TM Park Ave. Assocs.*, 214 F.3d at 348. If a damages remedy is available to a prevailing non-breaching party, a breach of contract has occurred, and no constitutional issue arises. *See, e.g.*, *TM Park Ave. Assocs.*, 214 F.3d at 349. If, on the other hand, a breaching party may invoke a statute as a defense to a breach of contract claim, the legislation works an impairment on a contractual relationship. *Id.*; *see also Horwitz-Matthews*, 78 F.3d at 1251 ("We must ask whether [the state entity], rather than merely breaking the [contractual] promise, . . . set up a defense that prevented the promisee from obtaining damages, or some equivalent remedy, for the breach.").

The availability of a damages remedy in this matter turns on the interpretation of section 10-397a. CRTD contends that section 10-307a establishes a clear method by which it may inherit the liabilities of its predecessor, GHTD. On this view, there are three prerequisites to CRTD's

assumption of GHTD's contractual liabilities. First, its board of directors must have voted to assume the liabilities of GHTD. Conn. Gen. Stat. § 10-397a(d). Second, CRTD's approved budget must have accounted for the costs arising from the assumption of liability. *Id.* Finally, the Commission must have approved of the assumption of liability by finding it fair and equitable. *Id.* As CRTD declined to take any of these actions, it maintains that, by operation of the statute, GHTD's liabilities did not transfer.

CRTD's construction of section 10-397a(d) traces the text of the statute, and is facially plausible. Section 10-397a(d) permits regional tourism districts to assume the liabilities of former districts if they so choose. Furthermore, before such a liability may be assumed, its cost must be incorporated into the regional district's approved budget, and the Commission must find that the "proposed assumption of liability is fair and equitable." Conn. Gen. Stat. § 10-397a(d). Taken together, these sentences seemingly grant CRTD the option of assuming GHTD's contractual liabilities, which it has not exercised. And it may be inferred that if CRTD has not assumed GHTD's contractual liabilities through the method outlined in 10-397a(d), it may not inherit GHTD's liabilities by any other means.

If CRTD's interpretation of section 10-397a is correct, the state has functionally erected a legislative barrier to recovery for the breach of any contract to which former tourism district is a party. Indeed, CRTD's position is that as a result of the statutory reorganization, (1) GHTD no longer exists, (2) CRTD bears no responsibility for the liability because it did not assume the liability under the process detailed in section 10-397a(d), and therefore (3) plaintiff is without a remedy. In effect, it proposes that section 10-397a extinguished the contractual liabilities of former tourism districts by failing to provide a mandatory process for transfer of those liabilities.

If CRTD's interpretation is correct, section 10-397a would seemingly impair its preexisting contractual relationship with plaintiff. *See TM Park Ave. Assocs.*, 214 F.3d at 349; *Horwitz-Matthews*, 78 F.3d at 1251.

An alternative construction of section 10-397a may avoid the constitutional problem.[21] For example, under section 10-397a(b), GHTD was required to "account[] for all liabilities" in order to determine whether it had a cash surplus as part of the winding up of its affairs. This phrase may be understood to require GHTD to pay down its then-existing liabilities before transferring surplus assets.[22] On this reading, the term "liabilities" is used in sections 10-397a(b) and 10-397a(d) to refer to liabilities that existed at the time when GHTD was dissolved and CRTD was created (or when section 10-397a was enacted). It would exclude contingent liabilities, such as the alleged contractual breach at issue in this case, which were not quantifiable, were perhaps unknown, and thus could not be "account[ed] for" when section 10-397a was enacted. On this reading, contingent liabilities, such as claims for breach of contract, may be understood to transfer to the successor tourism district, without operation of the process detailed in section 10-397a(d). If unrealized claims for breach of contract transferred to CRTD when it replaced GHTD in Connecticut's tourism scheme, a damages remedy for the alleged breach would remain available to plaintiff and no serious constitutional doubts would remain.

---

[21] The Court is guided by the canon that courts must construe statutes to avoid serious constitutional questions so long as that construction is not plainly contrary to legislative intent. *See, e.g., Jones v. United States*, 529 U.S. 848, 857 (2000) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.").

[22] As noted, the statute provides that "after [a former tourism district] account[s] for all liabilities," it "may distribute" its cash surplus to the new regional tourism districts serving the towns formerly served by the old district. Conn. Gen. Stat. § 10-397a(b). It then spells out the percentage distribution that may be transferred from the old districts to the new. *Id.*

Other interpretations of section 10-397a are possible. Because it appears that the question of whether this case gives rise to a constitutional violation depends on the construction of section 10-397a, the most prudent path forward is to afford the Connecticut Supreme Court the first opportunity to interpret the statute.[23]

## V.  Questions of Law to be Certified

For the foregoing reasons, the following questions of state law are certified to the Supreme Court of Connecticut, pursuant to Connecticut General Statute § 51-199b:

1.  Is the Central Regional Tourism District the legal successor to the Greater Hartford Tourism District, responsible for the former district's unpaid contractual obligations that existed at the time of the succession?

2.  If the answer to the first question is no, is some other entity responsible for those obligations?

3.  If the Central Regional Tourism District is the legal successor to the Greater Hartford Tourism District, does Connecticut General Statute 10-397a afford the Central Regional Tourism District an absolute defense to liability for the

---

[23] The Court need not conclusively address the third inquiry—whether the contractual impairment was substantial—at this juncture. It is likely, however, that if section 10-397a impairs CRTD's contract with plaintiff, the impairment is substantial. To determine substantiality, courts in the First Circuit examine the reasonable expectations of the contracting parties. *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999). Plaintiff did not operate in a heavily regulated industry, so would have had little expectation that a Connecticut statute would subsequently extinguish its entitlements under the contract. *See id.* (citing *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983)). Under the circumstances, the impairment of the contract would likely be substantial.

The remainder of the Contract Clause analysis inquires into whether the statute may nonetheless be upheld if it is "reasonable and necessary to an important public purpose," and, if so, whether the means used were reasonable and necessary to achieve its goal. *See Energy Reserves Grp.*, 459 U.S. at 411-12; *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 30 (1977) (holding that a state is not free to impose a drastic impairment when an evident and more moderate course would answer its concerns equally well); *Mercado-Boneta*, 125 F.3d at 13. The Court need not proceed with these inquiries at this time.

contractual obligations of the Greater Hartford Tourism District, when the Central

Regional Tourism District has not voted to assume the liabilities of the former

tourism district?

In accordance with § 51-199b(f), the Connecticut Supreme Court may reformulate any of

the questions.

## VI.   <u>Counsel of Record</u>

The parties with an interest in the certified questions are Single Source, Inc. and the

Central Regional Tourism District, Inc.  Their respective counsel are:

**Andrew D. Epstein**
Barker, Epstein & Loscocco
10 Winthrop Square
Boston, MA 02110
*Counsel for Single Source, Inc.*

**Fletcher Colin Thomson & Lawrence G. Rosenthal**
Rogin Nassau LLC
City Place I, 22nd Floor
185 Asylum Street
Hartford, CT 06103
*Counsel for Central Regional Tourism District, Inc.*

## VII.   <u>Order</u>

The Clerk of the Court is directed to forward to the Supreme Court of Connecticut, under

official seal, copies of this Memorandum and Order.  If requested to do so by the Connecticut

Supreme Court, the clerk shall deliver all or part of the record of this case to the Connecticut

Supreme Court for its use in deciding the questions of law certified.  This case shall be STAYED

pending a response to the certified questions from the Connecticut Supreme Court.

**So Ordered.**

                             /s/ F. Dennis Saylor

                             F. Dennis Saylor IV

Dated: May 17, 2011              United States District Judge